# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-2569

HENRY L. DAVIS,

*Plaintiff-Appellant,*

v.

CON-WAY TRANSPORTATION CENTRAL EXPRESS, INC.,
now known as CON-WAY CENTRAL EXPRESS, INC.,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 02 C 34—**Allen Sharp**, *Judge.*

———————

ARGUED DECEMBER 10, 2003—DECIDED MAY 18, 2004

———————

Before EASTERBROOK, MANION, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Henry L. Davis lost his job with Con-Way Central Express on December 11, 2000. Con-Way asserts it "economically terminated" Davis and eliminated his position because of a downturn in the trucking industry. Davis alleges it was because of his race, African American, and in retaliation for filing two charges of discrimination against the company. The district court granted Con-Way's summary-judgment motion on Davis's race discrimination

and retaliation claims. We affirm the judgment of the district court.

## I. History

The following is an account of the facts developed by the lengthy record in this case, related in the light most favorable to Davis, as is required at the summary-judgment stage of any proceeding. *See Rogers v. City of Chicago*, 320 F.3d 748, 750 (7th Cir. 2003). We pause to note that our findings track those made by the district court, upon which Davis has cast aspersions for its alleged failure to draw all inferences in his favor. After our own review of the parties' submissions, we find that the district court fairly summarized the evidence presented and did not neglect its duty. Rather, we are compelled to note that Davis has obviously misrepresented the record in more than several instances—both to the district court and to this court on appeal.[1]

---

[1] To provide but two examples for illustrative purposes, Davis mischaracterizes Dan Pence's testimony with regard to Con-Way's economic circumstances and Dennis Radican's testimony with regard to his opinion of the fairness of Davis's termination. Pence initially testified that Con-Way began experiencing an economic downturn after September 11, 2001, but later clarified, both in his deposition and in the errata sheet submitted after his review of his deposition, that he meant September of 2000, not 2001. Yet, Davis, in support of his pretext argument, referenced only Pence's testimony using the mistaken September 2001 date. Davis then declared that the company lied about its economic situation because Pence said the decline started a year later than what the company now claims. Our review reveals that Pence's testimony, as corrected, is clearly in line with the other witnesses, the company's own internal documents, and Pence's own e-mails during the relevant time frame, showing that the decline started in the fall of 2000, not 2001.

(continued...)

Davis worked for Con-Way's South Bend, Indiana service center in its maintenance department. Trucks delivered freight to the center and that freight was then sorted and reloaded onto other trucks for delivery within Con-Way's system. Davis started as a part-time, temporary employee in April of 1996, but was promoted in January of 1999 to the newly created shop maintenance specialist position, which was full time. The position, which had been added in some other Con-Way service centers, was designed to help get trucks on the road sooner and cut down on out-of-service time. When the service center manager at the time, Greg Monticcioli, proposed adding the position, Mike Grima, the director of maintenance and Monticcioli's superior, did not initially approve it. Grima thought that the South Bend service center was not large enough to warrant the extra staffing. He ultimately "flexed" to local management and approved the addition based on assurances that it would improve the center's efficiency. Grima then supported management's choice to promote Davis into the position.

Con-Way's organizational structure included several layers of management and branching reporting lines, which, for the purposes of this case, are important to understand. At all times during his employment with Con-Way, lead mechanic Dennis Radican directly supervised Davis. Radican reported to three superiors: the South Bend service center manager, a position held by Chuck Patrick beginning

---

(...continued)

When asked whether he thought Davis's termination was fair, Radican stated that it wasn't. When asked why, he said he felt it wasn't fair because he (Radican) had to pick up Davis's job duties. By citing only to Radican's testimony that he felt the termination was unfair, Davis attempts to characterize it as an admission that the decision was based on impermissible factors. Radican's testimony clearly lends no support to this theory.

in June of 1999 after Monticcioli left; the field maintenance manager, Brian Keck; and the director of maintenance, Grima. Keck worked out of Con-Way's central region office in Indianapolis, Indiana. Grima worked out of division headquarters in Ann Arbor, Michigan. Patrick, who was in charge of the entire South Bend service center facility, reported to Dan Pence, the central region manager. Pence was responsible for fourteen service centers, including South Bend, and, like Keck, worked out of Indianapolis. Pence reported directly to Kevin Hartman, the vice president of operations, located in Ann Arbor. Hartman reported to Dick Palazzo, the president and CEO, also in Ann Arbor.

On October 26, 2000, in a staff meeting at its division headquarters, the company discussed the possible need for workforce reductions—termed "economic terminations"— based on forecasts of a slowing economy. Pence, Grima, Hartman, Palazzo, and other upper management were present, including Rick Trott, Con-Way's director of human resources. Region managers, including Pence, were directed to supply Hartman with a service-center-by-service-center plan of adjustments necessary to ensure each region met its established goals. It was stressed that the various service centers needed to "rightsize" by matching employee counts to current and forecasted business levels. The region managers were also directed to supply Trott with lists projecting economic terminations by location.

Pence conducted a conference call with his fourteen service center managers, including Patrick, on October 27, 2000 to report on the staff meeting and the economic conditions discussed. Thereafter, on Monday, October 30, 2000, Pence e-mailed his service center managers, giving them until the end of the week to suggest ways to respond to concerns about the downturn in current and projected business levels. In terms of economic terminations, he encouraged them "to look at all positions in every service center, and make sure we are making the proper cuts in all

job classifications, including salary and hourly."

Patrick, who had already noticed that the business levels in South Bend were trending negatively, e-mailed Pence the next day with numerous suggestions. He included nine possible terminations, one of which was Davis. According to Patrick, he believed that the shop maintenance specialist position held by Davis, which had been created by Patrick's predecessor, Monticcioli, was no longer necessary given the economic circumstances.

Pence forwarded Patrick's termination recommendations to Trott in human resources. Trott, aware that Davis had previously filed two discrimination charges against the company,[2] sought justification for Davis's termination from the director of maintenance, Grima. Grima identified three centers, including South Bend, where the maintenance specialist position could no longer be considered "mission critical." In the other two centers, which were both larger than South Bend (they maintained a fleet of 150 and 184 trucks, respectively, compared to South Bend's 104), the

---

[2] Davis filed his first charge of discrimination on September 8, 1999, based primarily on what he perceived as racially harassing conduct from coworkers and his supervisors' failure to adequately address it. The South Bend Human Rights Commission ("SBHRC") dismissed the charge. The Equal Employment Opportunity Commission ("EEOC") adopted the SBHRC's conclusions as its own and issued a notice of right to sue. Davis did not bring any legal action against Con-Way for the instances alleged in the September 8, 1999 charge.

Davis filed his second charge of discrimination on January 17, 2000, again primarily based on what he perceived as racially harassing behavior perpetrated by coworkers and the company's inadequate response. As before, the charge was dismissed, and Davis chose not to sue.

maintenance specialist position was vacant. Grima determined that the absence of a maintenance specialist in those two facilities did not impair their ability to function and recommended that they remain vacant for the foreseeable future. As for South Bend, Grima supported the recommendation to economically terminate Davis and suggested eliminating his position entirely. Recounting that he never believed South Bend's size warranted the creation of the position, but permitted it because of local management's assurances of its success, he expressed that he had "seen no benefit whatsoever" from the position, as South Bend's productivity had not increased. He also noted that another similarly sized service center did not have a maintenance specialist position and had not "lost out on any operational 'readiness' . . . ."

Trott, hoping that the economy would improve, decided to delay giving final approval for Davis's termination despite Grima's justification. However, seven of the nine economic terminations recommended by Patrick for the South Bend facility were implemented between November 8 and 14, 2000. The other candidate for termination quit before the company could act on Patrick's recommendation.

Economic conditions continued to slide, in Con-Way's estimation. On November 29, 2000, Patrick submitted to Pence another set of belt-tightening recommendations, including economically terminating two more employees and again recommending Davis's termination because his position was one they could "survive without." Since Davis's responsibilities had been previously handled by other employees before the creation of his position, Patrick reasoned that Davis's job duties could be reabsorbed. Pence again forwarded the recommendations to Trott.

Meanwhile, South Bend's failure to meet its profitability goals had not escaped the notice of vice president Hartman. On December 4, 2000, Hartman e-mailed Pence and Patrick

directly about South Bend's profitability, stating that it was "obvious" more staffing reductions were needed. In terms of economic terminations, he encouraged Pence and Patrick to look at any area that would help return costs in line with revenues.

Pence telephoned Hartman to discuss his e-mail and to notify him that Patrick had anticipated his concerns and had already suggested additional economic terminations. In reviewing Patrick's suggestions with Hartman, Pence noted that Davis had been previously suggested as a candidate for economic termination, but that was not acted upon because of Trott. Hartman, who supported eliminating Davis because of the decrease in business levels at South Bend and because he believed the maintenance specialist position was not essential there, discussed the situation with Trott. It was then that he learned of Davis's race and his prior charges of discrimination against the company. Nevertheless, Hartman directed Pence to implement Patrick's suggestions for economic terminations, including firing Davis.

Davis's employment with Con-Way ended on December 11, 2000. At the time briefing closed in this matter, Con-Way had not filled Davis's position, his job duties having been assumed by Davis's former supervisor, Radican, and others in the maintenance department.

Including the ten at the South Bend facility, Con-Way ended up economically terminating approximately fifty employees in Indiana alone during the last quarter of 2000 and the first quarter of 2001 in response to the perceived economic downturn.

On February 22, 2001, Davis dual-filed a charge of discrimination with the EEOC and the SBHRC, his third against Con-Way. He alleged that his termination was due to his race and/or religion and/or was in retaliation for filing the two previous charges. After exhausting his administra-

tive remedies, he sued under Title VII, 42 U.S.C. §§ 2000e *et seq.*, claiming race-based harassment, discrimination, and retaliation. The district court granted summary judgment on all of Davis's claims. Davis only appeals the grant of summary judgment on the race discrimination and retaliation claims.

## II.  Analysis

We review a district court's grant of summary judgment de novo, and, as already noted above, we construe all facts and inferences in the light most favorable to the non-moving party. *Rogers*, 320 F.3d at 749; *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060 (7th Cir. 2003); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Cerutti*, 349 F.3d at 1060 (quoting Fed. R. Civ. P. 56); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

This is yet another case in which the appellant "appear[s] to have simply collected the sum total of all the unpleasant events in [his] work history . . ., dumped them into the legal mixing bowl of this lawsuit, set the Title VII-blender to puree and poured the resulting blob on the court." *Volovsek v. Wis. Dep't of Agric., Trade and Consumer Prot.*, 344 F.3d 680, 686 (7th Cir. 2003). Although poorly delineated, Davis appears to argue that he should have survived summary judgment on both his race and retaliation claims because he provided direct evidence that his termination was intentionally discriminatory and/or retaliatory. He also posits alternative theories, based on indirect evidence, that his economic termination was a pretext for Con-Way's true discriminatory and/or retaliatory intent. We will address

each argument in turn, starting with his race discrimination claim and concluding with his retaliation claim.[3]

## A. Race Discrimination

### 1. Direct Evidence

Direct evidence of race discrimination "is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Cerutti*, 349 F.3d at 1061. Direct evidence can take two forms. The first is an outright admission by the decisionmaker that the challenged action was undertaken because of the appellant's race. *Id.* (citing *Rogers*, 320 F.3d at 753). The second consists of a "convincing mosaic of circumstantial evidence . . . that point[s] directly to a discriminatory reason for the employer's action." *Id.* (internal quotations and citations omitted).

The closest thing Davis has to an admission of discriminatory intent by Con-Way is a statement by Pence, the central region manager, to Patrick, the South Bend service center manager, to "find a way get rid of him"—with "him" meaning "Davis." Davis overheard this statement on March 15, 2000 after Pence, who was visiting the South Bend service center in the course of his duties, verbally reprimanded Davis for being out of uniform. Davis was wearing a plastic baggie on his head to protect his hair from melting snow and ice while working under the trucks; the only headgear

---

[3] We note that the district judge did not consider Davis's alleged direct evidence of discrimination or retaliation (hardly the judge's fault, considering Davis's briefing below was even less clear than that presented to this court), granting summary judgment after evaluating Davis's case under the *McDonnell-Douglas* burden-shifting method. This error is harmless, however, because of our obligation to review this fully developed record de novo.

allowed under Con-Way's uniform policy was the company-issued cap. Davis later received a written "letter of instruction" for his violation of the uniform policy, which he claims is racially discriminatory because white employees were allowed to wear bandannas, sweat sponges, and other protective headgear without receiving such warnings.

Assuming that Pence's "find a way to get rid of him" statement was made because of Davis's race, it does not demonstrate that Davis's termination nine months later was the direct result of racial animus. Although Pence and Patrick both recommended Davis's termination as part of South Bend's strategy for dealing with the company-wide economic downturn, they were not the ultimate decision-makers. "'A decisionmaker is the person responsible for the contested decision.'" *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 600 (7th Cir. 2003), *cert. denied*, ___ S. Ct. ___, 2004 WL 405801 (2004) (*quoting Rogers*, 320 F.3d at 754). The record is clear that neither had the authority to act on any economic termination without the approval of Trott, the director of human resources. Moreover, in this instance, the final decision to terminate Davis was made by Hartman, the vice president of operations, after consulting with Trott. Pence's statement, therefore, sheds no light on Hartman's and Trott's motivations underlying the decision to terminate Davis's employment and cannot amount to direct evidence of discrimination. *See id.* (holding that a manager's allegedly discriminatory comments, who had input on hiring decisions but no actual hiring authority, did not amount to direct evidence of pregnancy discrimination).

Davis appears to take the position that Hartman and Trott simply "rubber-stamped" the recommendation by Pence and Patrick, which would make Pence and Patrick the true decisionmakers. But, the record does not bear this theory out. Rather, Hartman and Trott independently determined the economic necessity of Davis's termination. Trott did so by seeking input from Grima, and Hartman did

so through his individual analysis of South Bend's economic circumstances and subsequent consultation with Trott. This is not a case in which we should recognize Pence and Patrick as the actual decisionmakers under a "cat's paw" theory. *See Rogers*, 320 F.3d at 754 (noting that since there was no evidence that the decisionmaker "rubber-stamped" an alleged harasser's recommendation in placing her in a special program, the alleged harasser could not be considered the true decisionmaker).

Davis also argues that he can directly prove discriminatory intent through a "mosaic" of circumstantial evidence, but what evidence he relies upon to do so is unclear. We note that the majority of the facts he recounts that could be fairly described as indicative of possible racial animus relate to problems with his coworkers and with managers Patrick and Pence. Any examples of allegedly discriminatory treatment by coworkers is wholly irrelevant to the mosaic, as his coworkers had nothing to do with the decision to terminate his employment. *See, e.g.*, *Johnson v. Cambridge Indus. Inc.*, 325 F.3d 892, 896 (7th Cir.), *cert. denied*, ___ U.S. ___, 124 S. Ct. 535 (2003) ("In spite of the alleged racist comments from certain co-workers, Johnson lacks direct evidence of race discrimination . . . ."). Furthermore, as already explained above, since Patrick and Pence were not the decisionmakers, their actions do not bear directly on Hartman's and Trott's decision to terminate Davis's employment and thus are unpersuasive in establishing discriminatory intent under the direct method.

## 2.  Indirect Evidence

To survive summary judgment under the burden-shifting paradigm set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the plaintiff must first establish a prima facie case by meeting the following elements: (1) he was a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an ad-

verse employment action; and (4) other similarly situated employees who were not members of his protected class were treated more favorably. *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002) (citing *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1012 (7th Cir. 2000)). If Davis does this, the burden of production shifts to Con-Way to provide a legitimate, nondiscriminatory reason for terminating him. *Cerutti*, 349 F.3d at 1061. Davis must then rebut Con-Way's stated reason for his termination with evidence that it is just a pretext for race discrimination. *Id.* To demonstrate pretext, Davis must show that Con-Way's articulated reason for firing him (1) had no basis in fact; (2) did not actually motivate his discharge; or (3) was insufficient to motivate his discharge. *Wells*, 289 F.3d at 1006. In other words, "[a] pretext for discrimination . . . means something worse than a business error; pretext means deceit used to cover one's tracks." *Id.* (*quoting Grube v. Lau Indus., Inc.*, 257 F.3d 723, 730 (7th Cir. 2001)). "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000).

Con-Way concedes for the purposes of appeal that Davis can establish a prima facie case, instead arguing that its stated reason for firing him—economic conditions commanding the elimination of Davis and his "non-mission critical" position—is unassailable. Davis alleges the economic termination was mere pretext, and sets about proving it by challenging Con-Way's business determination that it was suffering an economic downturn, arguing that the company failed to observe seniority rights when it chose to fire him, criticizing Con-Way's rehiring policy, and describing his allegedly racially hostile work environment. None of these arguments are persuasive.

First, Davis argues that all the bluster about an economic downturn was a ruse and that really Con-Way was quite

profitable, as demonstrated by its penultimate parent, CNF Inc.'s, annual report. He also points to internal reports maintained by Con-Way tracking certain business indicators. We will not sit as a super-personnel department nor second-guess Con-Way's business strategies where, as here, Davis has provided no convincing evidence that the company lied about its financial concerns. *Stewart*, 207 F.3d at 378. Rather, all of the evidence points to a sincere belief that the economy was trending negatively and that economic terminations were an appropriate business response. In particular, we think it ridiculous to suggest that Con-Way would terminate nine other employees from Davis's facility, not to mention forty others from around the state of Indiana, on the pretense of economic hardship, just so it could cover its tracks with respect to Davis. *See*, *e.g.*, *Wells*, 289 F.3d at 1007 (rejecting the former employee's elaborate conspiracy theory regarding the transfer of jobs from Illinois to Wisconsin, which caused her to lose hers, because the record lacked a scintilla of evidence to support it). Whether Con-Way's concern over its economic prospects was real or imagined, it was not a pretext for race discrimination.

Second, Davis attacks Con-Way's methodology in selecting him for economic termination, alleging that he should have been insulated based on his seniority, but was not, because of his race. Davis's argument is a non-starter. The undisputed evidence, which Davis stubbornly ignores and wholly fails to rebut, is that seniority was observed within *job categories*, not across facilities as a whole. Therefore, when selecting individuals for economic termination, management would determine the number of positions within a job category that needed to be cut, then determine who those people would be based on their seniority—in other words, "last in first out." Unfortunately for Davis, he was in a job category that contained only one person—him. Although he may have been more senior than others at the South Bend

service center, he was senior to no one within his job category.

Third, Davis alleges that the company rehired white truck drivers and dock workers it economically terminated once economic conditions improved, but did not call him back to work for the company in any capacity, thus demonstrating that his economic termination was a pretext for racial animus. Yet, Con-Way provided unrebutted evidence that it calls back employees only into positions from which they were laid off because those employees are already trained in those positions and have the necessary certifications. Con-Way did not call Davis back because it did not rein-state the shop maintenance specialist position, the position from which he was laid off and the position for which he was trained. Further, there is no evidence that Davis had worked for Con-Way in any of the positions for which it chose to call back employees or that he actively reapplied for any open positions. Therefore, Con-Way's failure to re-employ Davis proves nothing about its stated reason for terminating him.

Finally, Davis alleges that Patrick and Pence tolerated a racially hostile work environment, failed to take his complaints seriously, and discriminatorily disciplined him.[4]

---

[4] The district court concluded that because certain events cited by Davis occurred outside the 300 days from the date he filed his third administrative charge (for example, the instances on which he based his first and second charges), they could not be relied upon as evidence of pretext. However, the Supreme Court has made clear in its recent case clarifying the "continuing violation" doctrine, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), that where, as here, the plaintiff timely alleged a discrete discriminatory act (*i.e.*, his termination based on his race and in retaliation for filing prior charges), acts outside of the statutory time frame may be used to support that claim. *See Morgan*, 536

(continued...)

Even if these allegations are true—and we make no determination that they are—they fail to demonstrate pretext on the part of the company. As discussed above in relation to Davis's direct evidence of discrimination, Patrick and Pence's possible prejudice against Davis fails to show that the actual decisionmakers, Trott and Hartman, lied about their reasons for choosing him for economic termination. Rather, Trott specifically testified in his deposition that race was not a factor in his decision to finally approve Davis's termination. And Hartman, who specifically called for more economic terminations in South Bend because its profitability continued to slip, did not know Davis's race at the time he formed his initial impression that Davis's position was one South Bend could do without. Hartman testified that the reason for moving forward on the termination was because of economic necessity, and despite, not because of, Davis's race.

In sum, Davis presents no evidence, under either the direct or indirect method of proving race discrimination, from which a trier of fact could infer that Davis's termination was motivated by his race.

## B. Retaliation

### 1. Direct Evidence

As with race discrimination claims, retaliation claims under Title VII can be proven either directly or indirectly.

---

(...continued)

U.S. at 113 ("Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.").

Again, the district court's failure to include acts outside the limitations period in evaluating Davis's claims does not warrant reversal, since we have taken into consideration all acts cited by Davis in rendering our decision on appeal.

In order to survive summary judgment using the direct method, "the plaintiff must present direct evidence of (1) a statutorily protected activity; (2) an adverse employment action taken by the employer; and (3) a causal connection between the two." *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003) (citing *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir.), *cert. denied*, 537 U.S. 879 (2002)). "Direct evidence" is defined the same for discrimination and retaliation claims— that is, it can be an admission of intentional discrimination or a "mosaic" of circumstantial evidence that directly points to a discriminatory intent. *See Volovsek*, 344 F.3d at 689-90; *Rogers*, 320 F.3d at 753.

Davis conflates much of the evidence offered in support of his race discrimination claim with his retaliation claim. For example, the only evidence he appears to offer of a direct admission of discriminatory intent is Pence's "find a way to get rid of him" statement to Patrick. Both Patrick and Pence ostensibly knew about his two discrimination charges, filed in September of 1999 and January of 2000, when Pence made the statement in March of 2000. As already explained above, since neither Patrick nor Pence were decisionmakers responsible for Davis's termination, this statement is irrelevant as direct evidence of retaliation.

Moving to the "mosaic" approach, Davis also cites two instances in which members of upper management referred to him as a "problem child" or "problem person." The first instance occurred July 27, 2000 after Davis refused to sign his annual review for the second time. The review had first been presented to him on July 13, 2000, but he refused to sign it then because he didn't agree with some of the rankings he received. After his supervisor, Radican, changed it somewhat so that it reflected more favorably upon him, Davis still refused to sign it. Keck, the field maintenance manager who worked out of Indianapolis, then sent an e-mail to his superior, Grima, giving him a "heads-

up" that they had a "problem child" on their hands. He then went on to state, "I believe we are all aware of the past issues with Mr. Davis. Chuck [Patrick], Denny [Radican] and I discussed on my last visit to [South Bend] less than two weeks ago." The remainder of the e-mail explains that Davis continued to refuse to sign his review, discusses the fairness of the review, and questions whether it is considered insubordination for an employee not to sign. The e-mail was "cc'd" to Pence, Patrick, and Radican.

Davis makes much of the e-mail's reference to "past issues" with Davis and wants us to infer that those "past issues" must refer to the charges filed some nine months and six months prior. Yet, the undisputed testimony from Keck and from those in receipt of the e-mail was that Keck was referring exclusively to Davis's failure to sign the first version of his review two weeks prior, and which was the topic of discussion on his last visit to South Bend. And, plaintiff elicited no testimony tending to show that Keck was even aware of Davis's charges.

Even if the e-mail was referencing Davis's charges and characterizing him as a problem person because of them, it is undisputed that Keck was not involved in the decision to terminate plaintiff's employment five months later. As with Patrick and Pence, there is no evidence that any prejudices Keck may have harbored infected Trott and Hartman's decision to economically terminate Davis.

The second instance Davis cites occurred on November 4, 2000 and was contained in an e-mail sent by Palazzo, the president and CEO, to Trott and Hartman in response to a report from Trott that Davis's employee file was missing from Radican's office and that Radican suspected Davis of taking it. When forwarding the report to Palazzo, Trott stated that he would keep him apprised of this "latest

debacle."[5] Palazzo responded that Radican should be taken to task for keeping a file separate from that maintained by human resources and stated, "[t]here's no doubt our problem person has obtained what we had on file."

Davis again wishes us to infer that Palazzo believes Davis to be a "problem person" because he filed discrimination charges and to further infer that Palazzo's poor opinion of Davis led Trott and Hartman to fire him a month later under the guise of an economic termination. Even if a trier of fact could infer that Palazzo based his "problem person" comment on more than irritation at a missing file, Davis has failed to prove a causal connection between this comment and Davis's termination. There is no evidence that Palazzo, except for generally directing that economic terminations may be necessary throughout the organization based on sinking profit margins, had any input in or responsibility for the decision to economically terminate Davis. The details of the plan to bolster the company's financial health were delegated to Hartman, Trott and their subordinates. The district court found that both Keck's and Palazzo's e-mails represented "stray comments" that had no meaningful bearing on Davis's job loss, and we agree with this characterization. *See Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 576 (7th Cir. 2003) ("Because of the temporal distance between the comments and the termination decision, as well as the lack of any connection to that decision, the district court properly viewed them as 'stray' workplace remarks, rather than evidence of the thought process behind Schuster's termination.").

Davis also argues that the "drastic" change in the way he was treated—*i.e.*, increased discipline—and evaluated by

---

[5]  According to Trott, there had been two instances of employee theft at South Bend shortly before Davis's file went missing, which is why he referred to the occurrence as the "latest debacle."

his superiors at the local level, namely Pence, Patrick, and Radican, after he filed his charges should be considered part of the mosaic with the above stray comments. We need not tarry long over this piece of the mosaic, again because Pence, Patrick, and Radican were not the decisionmakers. Their actions fail to demonstrate a causal connection between Davis's charges and his termination.

## 2.  Indirect evidence

Under the indirect method of proving retaliation, which mirrors that for discrimination, the plaintiff must show: (1) he engaged in a statutorily protected activity; (2) he performed his job according to his employer's legitimate expectations; (3) despite his satisfactory job performance, he suffered an adverse action from the employer; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Sitar*, 344 F.3d at 728. "If the plaintiff establishes these elements, the burden shifts to the defendant to come forward with a legitimate, non-invidious reason for its adverse employment action. . . . Once the defendant presents a legitimate, noninvidious reason for the adverse action, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual." *Id.* (citations omitted); *see also Volovsek*, 344 F.3d at 692. This formulation of the Seventh Circuit's test for retaliation claims supported by indirect evidence was only recently articulated in *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640 (7th Cir.), *cert. denied*, 537 U.S. 879 (2002).

Before the district court, Con-Way at first conceded in its opening brief that Davis could present a prima facie case of retaliation based on the test articulated in *Stone*, *supra*. Con-Way then argued the opposite on reply, stating that Davis could not establish a prima facie case. In ruling on

Davis's claim, the district court found that Davis failed to come forward with any evidence to suggest that he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity, and thus could not establish the fourth prong of his prima facie case. We agree with the district court's conclusion.

Davis argues, though, that since Con-Way at first conceded Davis established a prima facie case below, we should move beyond the prima facie showing and engage in the pretext inquiry. Even if Con-Way waived its arguments regarding Davis's failure to establish a prima facie case, Davis's retaliation claim still fails because he so clearly lacks any evidence of pretext.

In urging that Con-Way's stated reason for terminating him actually sprang from a retaliatory motive, Davis simply recycles all of the evidence previously reviewed and dispatched by this court as unpersuasive. For example, our view of Davis's challenges to Con-Way's business determination that it was suffering an economic downturn and his allegations that the company failed to observe seniority rights has not changed since we looked at it above in relation to his race discrimination claim. Nor are we any more convinced now than at previous points in this opinion that actions and statements by non-decisionmakers reveal the pretextual nature of Con-Way's decision.

### III. Conclusion

There are no issues of material fact that preclude summary judgment on Davis's race discrimination and retaliation claims. For this reason, the district court's decision granting summary judgment in favor of Con-Way is AF-FIRMED.

A true Copy:

    Teste:

                                    _____

                                    *Clerk of the United States Court of*
                                      *Appeals for the Seventh Circuit*