# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-3373

TONY BRUMMETT,

*Plaintiff-Appellant,*

v.

SINCLAIR BROADCAST GROUP,
INCORPORATED,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 03 C 3055—**Jeanne E. Scott**, *Judge.*

_____

ARGUED JANUARY 21, 2005—DECIDED JULY 6, 2005

_____

Before RIPPLE, WOOD and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Tony Brummett, an African-Ameri-
can male, filed this action against his former employer,

Sinclair Acquisition IV, Inc. ("Sinclair"),[1] for alleged race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. The district court granted Sinclair's motion for summary judgment. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

Sinclair owns and operates two television broadcast stations, known by the call letters WICS and WICD, located in central Illinois. In the fall of 2000, Sinclair decided to hire two additional account executives for its WICS sales staff.[2] Mr. Brummett, at the time an account executive at a competing television station, applied for one of the positions. He interviewed with the WICS/WICD General Sales Manager, Bob Evans, and the General Manager, Jack Connors. On November 30, 2000, Connors recommended Mr. Brummett for the position by an e-mail to his superior; the message stated in part:

> Brummett has been [at WRSP] for 2 1/2 years, and before that had 4 years at the Decatur Herald & Review newspaper. He told us that he was going to make between $41,000-43,000 next year, but that he would be

---

[1] Mr. Brummett named Sinclair Broadcast Group as the defendant, but the corporation's correct name is Sinclair Acquisition IV, Inc.

[2] At this time, one of Sinclair's account executives at WICS was Jennifer Valenti, who Mr. Brummett proposes as a comparable employee.

willing to step back a little to come here. . . . Brummett is the best bet we've been able to come across at WICS, and Bob thinks we could try to get him for $725-750/ week on a six month guarantee. We have perhaps $100,000 max of billing out of Springfield that we could shuffle his way, but this 7th [account executive] for WICS is going to be heavily developmental. As you know, we budgeted nothing on the expense side for a 7th seller in 2001. . . .

He's an experienced TV salesman in this market, in this city, and has relationships that he'll bring with him.

R.13, Tab E, Ex.8.

In January 2001, Sinclair hired Mr. Brummett as a WICS account executive. Evans offered him a guaranteed salary for his first six months of employment. During that time, he was expected to generate as much new advertising business as possible. For most account executives at Sinclair, once the initial six-month period ended, they were paid on a straight commission basis. According to Mr. Brummett, however, Evans promised him that, if his first six months' performance was acceptable, Evans would transfer existing accounts to Mr. Brummett from other account executives in order to bring his annual commissions up to $38,000.

In March 2001, Sinclair hired Tim Snodgrass as an eighth account executive for WICS. Evans made Snodgrass an offer similar to the one made to Mr. Brummett: Snodgrass would receive a specified weekly salary for the first six months and, if his performance was satisfactory, he thereafter would receive additional accounts that would yield a minimum level of annual commissions. Snodgrass quit his job at WICS before the end of his first six months.

When Mr. Brummett began working at WICS, he was given an account list of former advertisers who had not pur-

chased advertising in more than a year. He had a difficult time generating new business from this list because all of the large advertisers already had accounts managed by other account executives at WICS. Despite this difficulty, Evans, who had resigned in May 2001, testified that, at the time of his departure, he believed that Mr. Brummett was doing a good job and would have ranked him as "[m]iddle to up" among the account executives. *Id.*, Tab C at 89.

In July 2001, Sinclair hired Johnny Faith to be the General Sales Manager. That same month, at the end of Mr. Brummett's six-month probation period, Mr. Brummett's guaranteed weekly salary ended. On July 3, he was notified that his current level of sales would not support a $725 weekly draw against his commissions. His salary therefore was reduced by thirty percent effective July 2001, and he was told that Sinclair would adjust the draw upward in the future if his sales levels increased. Mr. Brummett expressed his dissatisfaction in an e-mail to Connors:

> I will need to speak with you on Thursday regarding my commission here at New[s] 20. I thought business will be much better here than Fox. I still believe that however, the way this econmy [sic] is going at this time it is pretty hard to sale [sic] anything. Jeff just gave me my commission statement where it stand[s] as of now. It is hard to believe six month[s] is over. Needless to say, I will be down half in my income that I made last year. Bob told me before he left "if things do not turn around he gave Cindy Barney Furniture just in case he had to give it to Tim or I." So with this in mind we need to sit down and come up with something. Because if not my life and the things I enjoy to do will change. I am sure things will start to turn around in this market but, I can't take that big of lost [sic] each month in my income.

*Id.*, Tab B at Brummett ID00122. Mr. Brummett met with Connors and Faith three times in July 2001, and he demanded the accounts promised to him by Evans which would generate an annual income of $38,000. Connors and Faith refused to acknowledge this arrangement.

On August 7, 2001, Mr. Brummett was notified that his "draw for August will be reduced by $722.97 as you did not cover your July amount." *Id.* at Brummett ID00124. Mr. Brummett again complained to Connors by e-mail:

> Jack, would it be possible for me to speak with someone from corporate? My August draw is now down to $322.86. This is about $8 an hour. Jack, as I discussed with you three times, I made considerable more this time last year. If I was not guaranteed what I was making at Fox it would not have been a reason to change job[s]. I have a list of corporate contacts so if you can point me in the right direction that will be great. Jack as you know this draw will not even pay my rent, car payment etc. Is something more going on?

*Id.* at Brummett ID00125. Connors responded by e-mail, stating:

> Do you have anything in writing from Bob Evans promising you more than six months of guarantee or asserting any kind of guarantee of billing from the accounts on your list? If you do I would be happy to review it.
>
> I did review your July sales and commissions statement this morning with Jeff Schlindwein, and last month the advances on your commission ($2,191.66) were considerably over your actual commission total ($1,418.69) for the month. I looked into your billing further and saw that your total July time sales were $17,615 against the monthly target of $28,000. This in-

cluded $12,185 in agency business, $4,140 in direct business and $1,290 in new business. It is standard station policy to recapture advances in excess of actual commission earned in the next payroll period.

If you would like to speak to someone at corporate you could call Joellen Adams in Corporate Human Resources.

*Id.* Mr. Brummett did not speak to anyone at Sinclair corporate headquarters.

On August 22, 2001, Faith presented Mr. Brummett with a Performance Improvement Agreement ("PIA"), which stated:

It has become evident during three July 2001 meetings with Jack Connors and me that you are dissatisfied with your compensation as an account executive at WICS/WICD. This dissatisfaction stems from the end of your six-month probationary period with a guaranteed salary and your transition to full commission in July 2001.

As we have discussed in those meetings, certain aspects of your job performance have been unsatisfactory. Specifically, the attainment of your monthly revenue goals and your development of new business have not been where both you and the company had envisioned. Therefore, substantial improvement in these areas is necessary if you are to continue to be employed by the company.

In hopes of improving your performance for a sustained period, you are being issued this performance improvement agreement. At this time, we are going to extend your probationary period a final 40 days (through September 30, 2001) during which time your

job performance must improve. The performance must be maintained consistently or your employment may be terminated. If you need assistance in meeting the stations [sic] performance expectations, please let me know and we can review the situation to determine whether the assistance requested is feasible and/or practical. Jack or I am readily accessible to answer any questions you may have about our expectations.

*Id.*, Tab E, Ex.3. The PIA listed five expectations for Mr. Brummett to meet during the extended probationary period: (1) service and maintain his existing business; (2) generate $9,000 in new business; (3) achieve 100 percent of his monthly quota of sales; (4) make a minimum of five face calls per day, five written presentations per week, ten letters to clients per week and one suggestion for a new business incentive package per week; and (5) sell one Olympic package and one Career Connection Campaign.

In a September 3, 2001 memorandum, Mr. Brummett responded to Faith, stating:

Johnny, as I told you in that meeting, I were [sic] not aware of any performance problems here at the station. My goals have not been attainable, all the large accounts seemed to be gone, and I have to work on getting all the small accounts to make up for what a large account is worth. As we all have discussed, the economy is not going in the same direction as this time last year.

Johnny, you and I know the truth here. This company does not want to pay me what I was promised so you are saying my "performance is a issue". Johnny, you know these requirements are not even realistic. If I write letters, work on presentations, meetings, projections, makegoods, and take care of current clients where

would I get the time to bring in this much business. You know all the larger accounts have been taken.

I am told to sale [sic] one Olympic package and a Career Connection. Account executives who have been here for years have not sold these packages. Keep in mind I sold the first career connection and another one that you took.

Therefore, I was advised by my attorney, John Baker not to sign the agreement. One reason, and the main one is that, you have not and are not requiring other AE's to do the same. In addition, you and I both know an Account Executive could not fulfill these goals on their best day. Especially when you are adding continuous stress on a person. Also, my probation period ended when my draw was reduced and I should have received additional accounts to get me to $38,000 what I was guaranteed.

*Id.*, Tab B at Brummett ID00131.

Mr. Brummett could not meet the goals listed in the PIA. On October 19, 2001, Connors and Faith terminated his employment. Mr. Brummett then filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights. After securing a right to sue letter from the EEOC, he filed this action.

## B.  District Court Proceedings

The district court ruled that Mr. Brummett's race discrimination claim could not survive summary judgment because he had no direct evidence that Connors and Faith had been motivated by race and, alternatively, because he had failed

to establish a prima facie case of discrimination. Specifically, the court determined that Mr. Brummett had not raised a genuine issue of material fact that Sinclair had treated him less favorably than any similarly situated employee outside of his protected class. In reaching this conclusion, the district court distinguished all of the WICS/ WICD account executives, apart from Snodgrass, based on Mr. Brummett's purported salary arrangement. The district court explained that

> [n]o account executive worked under the same terms and conditions of employment as Brummett. Only Brummett and Snodgrass received a guarantee of a minimum annual income after the first six months of employment. The other account executives were promised a negotiated weekly draw for the first six months of employment, but thereafter each expected to be paid straight commission based on his or her sales only. Brummett has not shown that any of the other account executives was promised a guaranteed minimum annual income after the initial six-month period expired. This is a material difference between Brummett's terms and conditions of employment and other account executives'. Brummett's entire conflict with Sinclair centered on Connors and Faith's unwillingness to honor Sinclair's contractual obligation to provide Brummett with the promised accounts. Because none of the other account executives (other than Snodgrass) worked under this critical condition of employment, Connors and Faith were never faced with the question of

whether to honor such a guarantee. The other account executives, therefore, were not similarly situated.[3]

R.22 at 16.

Next, the district court concluded that Snodgrass also was not a comparable employee to Mr. Brummett because Snodgrass had "quit so early in his tenure at WICS-TV, he was never contractually entitled to additional accounts that would raise his commissions to a stated annual income level. Connors and Faith, thus, never had the opportunity to

_____

[3] Anticipating Mr. Brummett's possible arguments on appeal, the district court stated that

> Brummett could argue that the Court did not view the evidence in the light most favorable to him when reaching the conclusion that he was not similarly situated to the other account executives. The evidence could be viewed as showing that Brummett was on straight commission without any contractual right to additional accounts that would guarantee him a minimum annual income of $38,000.00 in commissions. This view of the evidence is supported by Connors' testimony. This view of the evidence, however, is completely inconsistent with Brummett's evidence and theory of the case. Furthermore, Brummett would still not be similarly situated to the other account executives because no other account executive was vigorously and vociferously demanding commissions to which he or she was not entitled. Under this view of the evidence, the PIA was a reasonable response to Brummett's unreasonable demands; no other account executive was subjected to the PIA because no other account executive was making these types of demands. Under either view of the evidence, the other account executives were not similarly situated.

R.22 at 17 n.4.

treat Snodgrass more favorably than Brummett." *Id.* at 17 (citing *Steinhauer v. DeGolier*, 359 F.3d 481, 484-85 (7th Cir. 2004)).

## II
## DISCUSSION

### A. Standard of Review

We review a district court's grant or denial of a motion for summary judgment de novo, viewing all facts and reasonable inferences from the record in the light most favorable to the nonmoving party. *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 352 (7th Cir. 2002). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party. *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 527 (7th Cir. 2003).

### B. Race Discrimination Claim

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Lacking any direct evidence of racial animus,

Mr. Brummett relies upon the indirect method of proving discrimination established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this method, the plaintiff must first establish a prima facie case of discrimination. *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004). If the plaintiff meets this burden, the burden shifts to the employer to present a legitimate and non-discriminatory reason for the employment action. *Id.* If the employer does so, the plaintiff must show that the proffered reasons are a pretext for discrimination. *Id.*

To make the prima facie showing, Mr. Brummett must show four elements: (1) he belongs to a protected class; (2) his performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated others not in his protected class received more favorable treatment. *Id.* It is undisputed in this case that Mr. Brummett, as an African-American, belongs to a protected class and that he suffered an adverse employment action when his employment was terminated. However, as we shall discuss in some detail, Mr. Brummett has not raised a genuine issue of material fact as to whether he was treated less favorably than employees outside of his protected class who were similarly situated to him.

A similarly situated employee for purposes of proving discrimination refers to "employees who were 'directly comparable to [the plaintiff] in all material respects.' " *Ajayi*, 336 F.3d at 532 (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). To evaluate whether two employees are directly comparable, we consider all of the relevant factors, "which most often include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same

supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered the latter factors in making the personnel decision." *Id*. "Above all, we are mindful that courts do not sit as super personnel departments, second-guessing an employer's facially legitimate business decisions." *Id*.

### 1. Jennifer Valenti

Mr. Brummett claims that we should compare Sinclair's treatment of him to Sinclair's treatment of account executive Jennifer Valenti. Although Valenti and Mr. Brummett had the same supervisor, the same job duties and the same expectation of meeting a monthly sales quota, we cannot conclude that they are directly comparable. Mr. Brummett maintains that he had a unique arrangement with respect to his compensation. *See Spath v. Hayes Wheels Int'l-Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) (noting that comparable employees must be similarly situated "in all respects"). The record contains no evidence that, like Mr. Brummett, Valenti had been promised that she would receive additional accounts after her first six months or that she ever had demanded aggressively such accounts. Although Connors' and Faith's stated reason for firing Mr. Brummett was inadequate sales, the record amply reflects that Mr. Brummett's salary demands, and Connors' unwillingness to meet them, were an important factor in the employment relationship.

Furthermore, even if we determined that Valenti was a similarly situated employee, the record does not reflect that Sinclair held Mr. Brummett to a higher standard. Mr. Brummett claims that, when one examines the percentage of his monthly quotas he achieved in 2001, he out-

performed Valenti, yet only he was placed on probation. Specifically, he submits that, on average in 2001, he met 79 percent of his monthly sales quotas, while Valenti met only 75 percent of her quotas. Also, when he was put on probation, he had achieved 70 percent of his monthly quota in the prior two months; by contrast, Valenti had achieved less than 70 percent of her quota in the same months. Moreover, he submits that Valenti reached less than 64 percent of her sales quota during five months in 2000 but never was disciplined.[4]

Mr. Brummett's analysis overlooks Valenti's superior overall sales performance. For instance, in 2001, Valenti's sales totaled $227,524, and Mr. Brummett's totaled $137,959. Also, Valenti had a higher net billing in nine out of the first ten months of that year. *See* R.13, Tab E, Ex.9 at 65-73. In addition, the sales figures for August through October 2001 (when Mr. Brummett was under scrutiny) indicate that Valenti had the higher sales: (1) she developed six to eight new accounts each month, and Mr. Brummett had no more than three in any one month; (2) her *lowest* monthly net billing was $26,807, and Mr. Brummett's *highest* month was $19,289; and (3) she achieved 86 to 141 percent of her monthly quotas, and Mr. Brummett achieved 74 to 77 percent. In sum, although the two employees' performance is somewhat comparable based on the annualized percent of monthly quota achieved, as Mr. Brummett suggests, it cannot be said that Mr. Brummett was outperforming Valenti when her total sales and recruitment of new business were higher.

---

[4] Mr. Brummett also suggests that his sales goals were set unrealistically high. Sinclair counters that Mr. Brummett ignores the fact that his monthly goals, at least after May 2001, were keyed to the level of income that he demanded.

Connors' deposition testimony further supports that Valenti was not held to a lower standard; he explained:

> Q. Can you reflect upon [Jennifer Valenti's] numbers for [May 2001]?
>
> A. Jennifer had been there for almost four years, not quite four years. When someone has been on staff for that long a period of time, you are going to see they're going to be more prone to fluctuations based on a number of factors. It could be that they have some seasonal accounts, for example, and the seasonal accounts would contribute billing at a certain time of the year and not at other times of the year.
>
> What I would typically look for is to see if someone is under quota on one or two months, are they then over quota on another one or two months. If someone is consistently under quota month after month after month after month, then that tells you something. But if someone is up and down, that tells you that it's a business with some variability built into it.
>
> Q. And as of May 2001, if you recall, did you have any particular concern about Ms. Valenti's sales performance?
>
> A. I wouldn't say I had any particular concerns because you don't view it as a snapshot of one month, you view it on a continuum.
>
> Q. But as of May 2001, was she on a list of someone you were watching because you had concerns about the pattern that was developing and it was a consistent downward trend?
>
> A. No. Because it wasn't on a consistent downward trend.

*Id.*, Tab E at 97-98.

Thus, we conclude that Mr. Brummett and Valenti are not similarly situated employees, and, as a result, no discriminatory intent can be inferred from the fact that Sinclair never put Valenti on probation nor terminated her employment. *See Spath*, 211 F.3d at 397.

### 2. Timothy Snodgrass

Mr. Brummett also points to account executive Snodgrass as a similarly situated employee. This comparison is not apt. Like Mr. Brummett, Snodgrass was promised by Evans that he would be given certain accounts after six months' employment, assuming his performance was satisfactory, in order to obtain a minimum annual income. Unlike Mr. Brummett, however, Snodgrass resigned before his probationary period ended. Therefore, Connors and Faith never had to choose whether to honor or refuse Evan's promise. Moreover, Mr. Brummett and Snodgrass "were not similarly situated because [Snodgrass] was still on probation while [Mr. Brummett] was not." *Steinhauer*, 359 F.3d at 485 (collecting cases).

In sum, Mr. Brummett has not presented a similarly situated employee who was not in his protected class and who Sinclair treated better than him. Because he cannot establish this element of the prima facie case of discrimination, the district court's grant of summary judgment was appropriate.[5]

---

[5] Even if Mr. Brummett could make the prima facie showing, his claim would fail because he lacks evidence of pretext. Put simply, the record bears no hint that his "race had anything to do with his termination." *Brummett v. Lee Enters.*, 284 F.3d 742, 745 n.1 (7th Cir. 2002) (noting that Mr. Brummett's claim against his previous employer could not satisfy the pretext prong of
(continued...)

**Conclusion**

For all of the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*

---

[5] (...continued)
*McDonnell Douglas* because the record had no evidence of racial animus).

---