In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 05-3002

LINH THANONGSINH,

*Plaintiff-Appellant*,

*v.*

BOARD OF EDUCATION, DISTRICT
U-46 and HANAN JAVETZ, individually
and in his official capacity,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 8842—**Samuel Der-Yeghiayan**, *Judge.*

_____

ARGUED FEBRUARY 10, 2006—DECIDED SEPTEMBER 13, 2006

_____

Before POSNER, RIPPLE and KANNE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* On December 8, 2003, Linh Thanongsinh, a custodian at Oakhill Elementary School, brought the present suit against his employer, School District U-46 (the "School District"), and his supervisor, Hanan Javetz, in his individual and official capacities. Mr. Thanongsinh alleges that he was demoted from Group V Head Custodian to Group II Building Custodian in violation of both Title VII, *see* 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981(a). The district court granted summary judgment in

favor of the defendants. The plaintiff now appeals. We affirm in part and reverse in part the judgment of the district court and remand for proceedings consistent with this opinion.

# I

## BACKGROUND

### A. Facts

Mr. Thanongsinh, an Asian-American of Chinese and Laotian descent, began working as a custodian for School District U-46 in 1991. He subsequently was promoted to the position of Group V Head Custodian and assigned to Oakhill Elementary School in Kane County, Illinois. His immediate supervisor at Oakhill was Hanan Javetz, the Director of Plant Operations for the School District.

Mr. Thanongsinh received consistently favorable work performance evaluations while employed as a Group V Head Custodian at Oakhill. For example, in 2001, the principal of Oakhill, Carolyn O'Neal, ranked as "outstanding" or "exceptionally high" Mr. Thanongsinh's job knowledge, quantity and quality of work, dependability, organization, flexibility and potential level of ability; Mr. Thanongsinh was given "excellent" or "high" marks in the remaining categories, attendance and cooperation. R.28, Ex.B at 4-5. O'Neal remarked in this evaluation that Mr. Thanongsinh is "fussy about things being done right. This was especially evident after our retrofitting project was completed," *id.* at 4, and that "he can do many things in the way of repairs, and he does so," *id.* at 6.

Similarly, in 2002, O'Neal gave Mr. Thanongsinh the highest marks possible in the categories of job knowledge,

quantity of work, dependability, organization, flexibility and potential level of ability. He received favorable marks in the other categories—quality of work, attendance and cooperation. O'Neal added the following comments:

> Linh has a wide variety of skills related to maintenance and upkeep of the physical plant, equipment and supplies. These skills are evidenced by the work he has done in the areas of plumbing, electricity, and HVAC, without assistance of those in the trades.

*Id.* at 1. O'Neal concluded that Mr. Thanongsinh is fully "capable of handling more responsibility." *Id.* at 2.[1]

The employment of School District custodians is governed by a collective bargaining agreement between the School District and the Education Support Services Organization, the union that represents School District employees. In late 2002, the School District and the union, due to budgetary constraints, agreed to phase out Group V custodians through the implementation of a two-part certification process. To remain a Group V custodian under the 2002-2005 Collective Bargaining Agreement (the "Agreement"), the employee first was required to score at least 50 out of 100 on a written exam. If he scored below 50, he was

---

[1] Mr. Thanongsinh also received an outstanding employee evaluation in 1999. He was given excellent marks for job knowledge, quantity and quality of work, cooperation, organization, flexibility and potential level of ability; he received an above average mark for dependability and attendance. The School District official performing the evaluation noted that Mr. Thanongsinh's "most impressive characteristic is the pride and ownership he shows for Oakhill School. As a result, he takes the initiative to keep everything in good repair." R.28, Ex.B at 8.

permitted to retest; if, however, after the second try, he did not pass the written exam, he would not be allowed to proceed to the second portion of the exam, which tested hands-on skills. By contrast, those who scored 50 or above on the written exam then were asked to perform tasks for which a Group V Head Custodian traditionally is responsible—for example, testing boiler water and performing asbestos and playground inspections.[2] To obtain certification, the employee's average score from the two portions of the test had to equal or exceed 70. *See* Collective Bargaining Agreement, R.24, Ex.G-1.

Mr. Thanongsinh took the written portion of the test in November 2002. He received a score of 55. He proceeded to the hands-on portion of the exam, which was administered on March 14, 2003, by Mr. Javetz and Ron Dugo, the Maintenance Supervisor for the School District. He received a score of 66.62. The average of his written and hands-on scores was 60.81, which, under the terms of the Agreement, constituted a failing score.

Pursuant to this Agreement, Mr. Thanongsinh was permitted to retake the test. He received a score of 46 on the written portion and did not advance to the hands-on portion of the exam. Effective July 1, 2003, the School District therefore demoted Mr. Thanongsinh to the position

---

[2] The hands-on test covered ten topics: Change Electric Ballast, Switch or Outlet; Take Boiler or Cooling Tower Water Test; Test Low Water Cut-Off; Reset Security Alarm—Bypass Zone; What To Do In Full Fire Alarm During Occupied Hours; Asbestos Inspection; Rebuild Sloan Value or P-Trap; Playground Equipment Inspection; File on M.S.D.S. Sheets; and Change Schedule on EMS Time of Day/Holiday. *See* R.24, Ex.L.

of Group II Building Custodian.[3] As a Group V Head Custodian, Mr. Thanongsinh had earned $20.77 per hour; upon demotion, he suffered a pay loss of approximately $6 per hour. Although Mr. Thanongsinh remains employed as a custodian at Oakhill, numerous job responsibilities formerly performed by Mr. Thanongsinh were reassigned upon his demotion to a Group 9 employee, Mike DiGioia, who visits Oakhill once weekly.

Shortly after Mr. Thanongsinh's demotion, his union representative requested a grievance-based meeting with School District officials to discuss the reduction in pay associated with Mr. Thanongsinh's demotion. The persons present at this meeting included Mr. Thanongsinh; his union representative; Catherine McNamara, a School District Supervisor; and Mr. Javetz. Mr. Thanongsinh expressed at the meeting his frustration with the difficulty of the test; Mr. Javetz's response to Mr. Thanongsinh's concerns is the subject of vigorous dispute between the parties. In his affidavit, Mr. Thanongsinh claimed:

> At the meeting, I began explaining my side of the story regarding the hands-on portion of the certification testing program. Mr. Javetz crossed his arms and said in an argumentative manner that he could not understand

---

[3] The second written test had been administered prior to the exhaustion of six months following the conclusion of the first certification exam, in violation of the Memorandum of Understanding between the union and the School District. Therefore, the School District agreed to allow Mr. Thanongsinh a third opportunity to take the certification exam after his demotion. He scored a 35.91 on the written portion of the third exam, which was administered on September 26, 2003; he did not proceed to the hands-on portion of the examination.

me. He immediately thereafter stated that I should learn better English. Mr. Javetz's comment about my alleged need to learn better English was not made in response to any statements by me in regard to the written portion of the certification exam or my English language abilities.

R.28, Ex.D at 2. Mr. Javetz, by contrast, testified in his deposition that he merely suggested to Mr. Thanongsinh that he improve his English skills because, without such skills, there would be little opportunity for job advancement:

I said any position, . . . if you want to move to a higher position from four and higher, you have to take a written test; and to pass the test you need to have some basic or even a little higher than basic English skills. So to do that, to be more successful, you know, I would recommend that you can see if we had some free incentive administration, basically, the same idea, some programs that might be free to improve your skills.

R.24, Ex.D at 216.

## B. District Court Proceedings

Upon receiving a right-to-sue letter from the EEOC, on December 8, 2003, Mr. Thanongsinh filed a complaint in the United States District Court for the Northern District of Illinois against the School District and Mr. Javetz. He alleged that his demotion was motivated by his race, in violation of both Title VII, *see* 42 U.S.C. § 2000e *et seq.*, and

42 U.S.C. § 1981(a).[4] Specifically, Mr. Thanongsinh claimed that he had the "ability to meet and exceed the expectations for the hands-on test," but that Mr. Javetz's scoring and administration of that portion of the test was "racially motivated" and "willful and wanton."[5] R.12 at 4-5. He requested both equitable and legal relief, including back pay, attorneys' fees and compensatory and punitive damages.

After the district court denied the defendants' motion to dismiss, the defendants filed a motion for summary judgment. In this motion, the defendants contended that Mr. Thanongsinh had not established a prima facie case of discrimination and had not rebutted the defendants' claim that he was demoted for the legitimate, non-discriminatory reason that he was unable to pass the Group V certification exam. The defendants also contended that Mr. Javetz could not be held liable in his official capacity under Title VII

---

[4]  Mr. Thanongsinh's first complaint also stated a claim under state law for intentional infliction of emotional distress. His amended complaint, however, omits this claim for relief.

[5]  Mr. Thanongsinh does not allege that the written portion of the test was discriminatory. Although he suggests in his deposition that the test was unfair because it was written in English, the complaint itself is limited to the allegedly discriminatory administration of the hands-on portion of the exam.

Nor does Mr. Thanongsinh challenge the validity of the imposition of a hands-on certification requirement; rather, he challenges only the administration and scoring of that test. *See* Pl.'s Memo. of Law in Opposition to Def.'s Motion for Summary Judgment, R.27 at 1 ("Linh does not complain about Defendants' decision to administer a hands-on certification test.").

because the claim was duplicative of the plaintiff's claims against the School District.

In response to this motion, Mr. Thanongsinh invited the court's attention to three pieces of evidence that he claims demonstrate that the hands-on portion of the test was scored in a discriminatory manner. First, according to Mr. Thanongsinh, he was scored in a manner different from at least one Caucasian custodian, Mitchell Cain. Specifically, on Topic 9 of the hands-on exam, Group V Head Custodians were required to demonstrate their knowledge of how to complete Material Safety Data Sheets ("M.S.D.S."). Mr. Thanongsinh forgot to bring his M.S.D.S. materials to the exam and therefore was awarded zero points for these questions. Cain's score sheet indicates that he also forgot to bring his M.S.D.S. materials to the exam; nevertheless, Mr. Javetz and the other School District official administering the exam asked Cain the relevant M.S.D.S. questions, and Cain was awarded a score of 10 out of 10 on Topic 9. Second, Mr. Thanongsinh contended that he was not given "calming instructions" at the commencement of the hands-on exam, as were Caucasian applicants. R.27 at 7. As a result, the testing room was filled with "tension in the air," causing Mr. Thanongsinh nervousness and anxiety and, ultimately, resulting in mistakes on the exam. *Id.* at 8 (internal quotation marks omitted). Third, Mr. Thanongsinh claimed that Mr. Javetz gave Caucasian custodians an average score on the hands-on exam of 79.5, while he gave minority custodians an average score of 67.2, supporting an inference of discriminatory intent.

On March 23, 2005, the defendants filed a supplemental motion for summary judgment, requesting that the court also dismiss Mr. Thanongsinh's claims against Mr. Javetz in his individual capacity. The defendants contended

that the plaintiff had failed to demonstrate that Mr. Javetz "personally participated" in the administration of the written tests that led to Mr. Thanongsinh's demotion. R.35 at 2.

The district court granted the defendants' motions for summary judgment on June 13, 2005. Applying the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the court first held that Mr. Thanongsinh was not qualified as a Group V Head Custodian:

> Thanongsinh admits that he attempted to obtain certification on three separate occasions and that he received a failing score on all three attempts. Thanongsinh was given every opportunity to achieve certification. The fact that on two of his three attempts he could not even proceed past the written portion of the certification process which tests his knowledge of the requirements for a Group V position is a clear indication that he was not qualified for the position.

R.40 at 7-8 (internal citations omitted).

The district court next concluded that Mr. Thanongsinh had failed to identify similarly situated individuals who were treated more favorably than he. Mitchell Cain, according to the court, perhaps was similarly situated to Mr. Thanongsinh because both were Group V employees, but the only evidence that Cain was treated more favorably than Mr. Thanongsinh—the interview score sheet— was inadmissible at trial. According to the court,

> Thanongsinh has pointed to no testimony or evidence that would lay a proper foundation for the introduction of the score sheet at trial. In the testimony of Dugo that Thanongsinh refers to on this issue, Dugo

> merely indicated what information he saw on the paper given to him at the deposition.

*Id.* at 10-11. Additionally, Mike DiGioia, the Caucasian employee who took over various custodial responsibilities from Mr. Thanongsinh at Oakhill, is not similarly situated to Mr. Thanongsinh because he is not a Group V employee. Notably, he was not required to take the Group V certification exam, the subject of the present litigation. The court further rejected the contention that the Caucasian employees who had taken the Group V certification exam and therefore are similarly situated to Mr. Thanongsinh were treated more favorably than he was because of "calming instructions" administered at the beginning of the exam. *Id.* at 13. There is no evidence, according to the district court, that the administration or non-administration of these instructions was based on the applicant's race. Rather, one of the interviewers, Cathy McNamara, gave the instructions to *all* candidates, whereas other interviewers, such as Dugo and Mr. Javetz, gave the instructions to *no* candidate. *See id.* at 14 (concluding that the calming instructions were "merely how McNamara chose to speak to the test takers before administering the tests").

The district court also held that, even if Mr. Thanongsinh could establish a prima facie case of discrimination, the defendants had offered a legitimate, non-discriminatory reason for his demotion—that Mr. Thanongsinh failed the certification exam. According to the district court, the plaintiff had not established that this reason was pretextual. First, Mr. Thanongsinh's favorable work performance evaluations as a Group V Head Custodian "do[] not automatically mean that he would not make mistakes on the test." *Id.* at 16. Moreover, Mr. Thanongsinh's comparison of passage rates for minority versus non-minority candidates

was based on "pure speculation"; the relevant inquiry is not the raw scores received by candidates of a particular race, but "whether all applicants received fair scores based upon their performance on the tests." *Id.* Evidence that Mr. Javetz harbored animosity towards Mr. Thanongsinh also was not dispositive, according to the court: Stress or tension in the examination room logically could be attributed to the "natural atmosphere that might develop during a test which is often a stressful experience for a test taker." *Id.* at 17. Finally, the district court held that the stray comment by Mr. Javetz in the post-demotion meeting that Mr. Thanongsinh "should learn better English" merely was intended as helpful advice; it simply is "not sufficient evidence to meet the pretext requirement even when considered with the other evidence mentioned above." *Id.*

With regard to the Title VII and § 1981 claims against Mr. Javetz in his official capacity,[6] the district court dismissed them as redundant, holding that they were "synonymous with [the] claim against the public entity itself." *Id.* at 18-19.

Lastly, the district court granted summary judgment to the School District and Mr. Javetz in his individual capacity on the plaintiff's § 1981 claims. It held that there was no evidence of a "policy or practice" of discrimination by the District. *Id.* at 19. With regard to the individual claim against Mr. Javetz, the court reiterated that Mr. Thanongsinh had failed to establish a prima facie case of discrimination and held that there certainly was no specific evidence that any discriminatory conduct "con-

---

[6] Mr. Thanongsinh conceded in the district court that the Title VII claim against Mr. Javetz in his individual capacity should be dismissed. *See* R.40 at 18.

cerned the making and enforcing of a contract," a requisite element of a § 1981 cause of action. *Id.* at 20 (internal quotation marks omitted).

The plaintiff timely appealed.

## II

## DISCUSSION

The plaintiff submits that the district court erred in dismissing his Title VII claims against the School District[7] and his § 1981 claim against Mr. Javetz in his individual capacity.[8] Our review of a district court's judgment on a motion for summary judgment is de novo. *See In re Copper Antitrust Litig.*, 436 F.3d 782, 788 (7th Cir. 2006). Summary judgment is appropriate when "there is no genuine issue as

---

[7] Mr. Thanongsinh also challenges the district court's dismissal of his Title VII claim against Mr. Javetz in his official capacity. The district court held that this claim was duplicative of his claim against the School District. We agree. The covered entity under Title VII is the "employer." 42 U.S.C. § 2000e-2(a). As a result, we have "interpret[ed] the statute not as imposing personal liability on agents, but as invoking the doctrine of *respondeat superior* to make employers responsible for the actions of their agents." *Gastineau v. Fleet Mortg. Corp.*, 137 F.3d 490, 493 (7th Cir. 1998). Because the claim against Mr. Javetz is a claim against his office, for which his employer, the School District, would be liable, it is no different than his claim against the School District itself. The claim therefore was properly dismissed by the district court.

[8] Mr. Thanongsinh does not pursue on appeal his Title VII claim against Mr. Javetz in his individual capacity, his § 1981 claim against Mr. Javetz in his official capacity or his § 1981 claim against the School District.

to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Our function is not to weigh the evidence but merely to determine if "there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In performing this task, we must construe all facts and draw all reasonable inferences from those facts in the light most favorable to the nonmoving party. *See id.* at 255.

## A. Title VII

Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff can establish a prima facie case of discrimination in response to a motion for summary judgment in one of two ways: by producing direct or circumstantial evidence under the direct method of proof; or by utilizing the indirect, burden-shifting method set forth in *McDonnell Douglas*, 411 U.S. 792.

Mr. Thanongsinh relies on the indirect method of proof, which requires him to demonstrate that he: (1) is a member of a protected class; (2) is qualified for the position sought; (3) was rejected for the position; and (4) was treated less favorably than similarly situated individuals outside of his protected class. *See id.* at 802. If a plaintiff fulfills all four requirements, then the burden shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the adverse employment action taken. *See id.* at 802-03. The plaintiff ultimately bears the burden of producing sufficient evidence from which a reasonable fact-finder could con-

clude that the defendant's proffered reason is pretextual. *See id.* at 804.

Mr. Thanongsinh raises three issues with regard to his Title VII claim: whether he is qualified for the position of Group V Head Custodian; whether he has identified similarly situated individuals outside his protected class who were treated more favorably than he; and whether his failure to pass the hands-on portion of the certification exam constitutes a non-discriminatory, non-pretextual justification for his demotion.[9] We address each of these issues in turn.

### 1. Qualification

To show that he was meeting his employer's legitimate expectations at the time of his demotion, Mr. Thanongsinh relies on his 2000 and 2001 work performance evaluations and the deposition testimony of Ron Dugo. *See* Dugo Dep., R.28, Ex.C at 17 (stating that, under Mr. Thanongsinh's care, Oakhill "was in generally good condition"). The defendants concede that Mr. Thanongsinh received strong annual employment evaluations, but contend that he nevertheless was not meeting the School District's legitimate expectations because he failed to obtain Group V certification under the terms of the Agreement between the union and the School District.

We do not think that the defendants can rely on the certification test to establish that the plaintiff lacks the

---

[9] The defendants do not contest that Mr. Thanongsinh is a member of a protected class or that his demotion constitutes an adverse employment action.

requisite qualifications to be a Group V Head Custodian. After all, Mr. Thanongsinh alleges that the administration of that examination in a racially discriminatory manner was the vehicle employed by the school board to demote him on account of his race. Consequently, the results of that examination cannot be the basis of establishing that Mr. Thanongsinh is unqualified as a Head Custodian.

Certainly, Mr. Thanongsinh's certification through a fairly administered examination would be a legitimate measure of his qualification as a Group V Head Custodian. Here, however, the integrity of the administered examination is at issue, and Mr. Thanongsinh is attempting to establish, through the indirect method, that the examination was administered in a racially discriminatory manner. At this initial stage of the proceedings, therefore, we must rely on the record evidence of Mr. Thanongsinh's performance, other than the examination, to determine whether he has met this initial requirement of his prima facie case.

The other evidence of record is the very favorable work reviews that he had received in the past for performing the duties of a Group V Head Custodian. Notably, performing on a daily basis tasks that are similar in form and substance to the tasks tested on the hands-on exam, Mr. Thanongsinh received consistently favorable annual reviews from the principal of Oakhill. He was commended for "the pride and ownership he shows for Oakhill School" in 1999, R.28, Ex.B at 8; his job knowledge and quality of work in 2001, *see id*. at 4-5; and his "wide variety of skills" and "capab[ility]" in 2002, *id.* at 1-2. This evidence is sufficient to show that Mr. Thanongsinh was performing his duties satisfactorily. *Cf. Johnson v. Zema Sys. Corp*., 170 F.3d 734, 743 (7th Cir. 1999) ("Johnson bears a burden only of producing some evidence that he was meeting Zema's legitimate

expectations. In coming forward with consistently positive employment evaluations and President Reyes' recommendation, Johnson has met his burden.").

The defendants nevertheless maintain that Mr. Thanongsinh's failure to pass the written certification exam on his second and third attempts demonstrates that he does not have the requisite skill level to perform competently the responsibilities of a Group V Head Custodian. They contend that there is no causal link between the allegedly discriminatory administration of the hands-on portion of the exam and Mr. Thanongsinh's demotion. In their view, Mr. Thanongsinh "suffered no adverse employment action at the time of his failure of the hands-on portion," but instead was not demoted until after having failed the written portion of the exam for the third time in September 2003. Appellees' Br. at 13.

We cannot accept this argument. At this stage of the proceedings, we must assume that there is at least the possibility that the scores Mr. Thanongsinh received on his second and third attempts to pass the written exam were tainted by the results of the hands-on exam. Mr. Thanongsinh testified in his deposition that he reviewed his materials for the first written exam in November 2002, but chose not to study before retaking the exam in June 2003 or in September 2003. *See* Supp. App., Ex.B at 290. A jury reasonably could conclude that Mr. Thanongsinh's indifference in preparing to retake the written exam was traceable to the defendants' discriminatory conduct: If an individual believes that the outcome of an event may be beyond his control because of an improper consideration, such as his race, it certainly is reasonable that he would exert less than maximum effort in readying himself for that event. *Cf. Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977)

("When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application."). Even if this were not true, we have no difficulty in finding a causal relationship between the defendants' allegedly discriminatory conduct and Mr. Thanongsinh's ultimate demotion. Reading the evidence in the light most favorable to the non-movant, Mr. Thanongsinh was required to retake the written exam only because of the defendants' discriminatory conduct; had the hands-on portion of the test been scored fairly, Mr. Thanongsinh would have received a passing score on his first certification exam. *Cf. Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 807 (7th Cir. 1999) (observing that, when the standards for assessing qualifications are themselves allegedly discriminatory, whether the plaintiff was meeting her employer's "legitimate performance expectations . . . dovetails with the issue of pretext" and requires a court to assume, for the purpose of reaching the pretext inquiry, that the plaintiff had made out a prima facie case).

The district court therefore erred in determining that Mr. Thanongsinh had not met his burden of establishing under *McDonnell Douglas* that he was meeting his employer's expectations as a Group V Head Custodian.

### 2. Similarly Situated Individuals

The district court also erred in determining that Mr. Thanongsinh had not identified similarly situated individuals outside of his protected class who were treated more favorably on the hands-on portion of the exam than he. To be similarly situated to the plaintiff, an individual must

be "directly comparable to [the plaintiff] in all material respects." *Brummett v. Sinclair Broad. Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005) (internal quotation marks omitted; alteration in original). In the course of this inquiry, "we consider all of the relevant factors," including

> whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered the latter factors in making the personnel decision.

*Id.* at 692-93 (internal quotation marks omitted). Mr. Thanongsinh identifies a number of similarly situated employees; we address each relevant individual in turn.

### a. Mike DiGioa

The first similarly situated individual identified by the plaintiff is Mike DiGioia, a Caucasian Group 9 Custodian employed by the School District. After Mr. Thanongsinh was demoted to the position of Group II Custodian, various custodial tasks previously performed by Mr. Thanongsinh at Oakhill were transferred to DiGioia, who travels among various elementary schools in the area and visits Oakhill once weekly.

The plaintiff's comparison is unavailing. Unlike Mr. Thanongsinh, who before his demotion was a Group V employee, DiGioia is a Group 9 employee. Although in some situations this may be merely a "job title[]," Appellant's Br. at 30 (internal quotation marks omitted), in this context it is a material distinction. Under the Agreement between the School District and the union, only Group V employees were required to take the Group V certifica-

tion exam; therefore, DiGioia, as a Group 9 employee, never took this exam. He was not "subject to the same standards" as, and cannot be considered "similarly situated" to, Mr. Thanongsinh. *Brummet*, 414 F.3d at 692.

### b. Mitchell Cain

Mr. Thanongsinh also identifies Mitchell Cain as a similarly situated individual. We agree that Cain meets the criteria of a similarly situated individual. Cain is a Caucasian male who, at the time of taking the Group V certification exam, had been employed by the School District as a Head Custodian for a year. In that position, he had a job description similar to and was subject to the same standards as Mr. Thanongsinh. Specifically, like Mr. Thanongsinh, Cain was required to obtain an average composite score of 70 on the certification exam to remain a Group V employee. Although it is not clear from this record whether Cain and Mr. Thanongsinh had the same supervisor, Mr. Thanongsinh and Cain's certification exams both were administered by Mr. Javetz.

Mr. Thanongsinh has presented sufficient evidence that he was treated less favorably than Cain by the interviewers. Notably, both men forgot to bring their M.S.D.S. materials to the hands-on portion of the exam. *See* Thanongsinh Score Sheet, R.24, Ex.L at D184 (interviewers handwrote "don't have" next to question 9); Cain Score Sheet, R.27, Ex.F (noting, in the narrative section, "No M.S.D.S. book").[10] The

---

[10] This document was under a protective order in the district court, and it never was produced on appeal, despite the parties' failure to renew the protective order in this court. *See* Seventh

(continued...)

test administrators therefore awarded Mr. Thanongsinh zero points on Topic 9 of the hands-on portion of the exam, which required the candidate to answer various questions related to the M.S.D.S. materials. *See also* Dugo Dep., R.28, Ex.C at 57 (explaining that Mr. Thanongsinh "[m]ost likely" received zero points on these questions because he did not bring to the interview his M.S.D.S. materials). But Cain, despite also failing to bring the relevant documents to the exam, was awarded ten points on Topic 9, after being asked by the interviewers follow-up questions related to the missing M.S.D.S. materials.

The defendants respond that the only evidence supporting the conclusion that Cain and Mr. Thanongsinh were treated differently by interviewers is inadmissible. The district court held that Mr. Thanongsinh had failed to lay a proper foundation for the admission of the document containing Cain's interview scores and the interviewers' handwritten notes; according to the court, because the document would be inadmissible at trial, it also could not be relied upon by Mr. Thanongsinh to survive summary judgment. We review the district court's evidentiary ruling for abuse of discretion. *See United States v. White*, 443 F.3d 582, 591 (7th Cir. 2006) ("This Court will reverse a district court's evidentiary ruling

---

(...continued)

Circuit Operating Procedure 10(a) (providing that all documents sealed by the district court are considered public in this court unless a motion is made to seal). Although the document is absent from the record, the parties admit to what the document contains—namely, proof that Cain did not bring with him to his hands-on interview his M.S.D.S. materials but nevertheless was awarded points on the question related to those materials. We interpret this admission as a stipulation by the parties as to the contents of the Cain score sheet.

only upon a showing that the district court committed an abuse of discretion.").

The district court abused its discretion when it excluded the interviewers' score sheet from Cain's interview and the handwritten notes on that sheet. This document is admissible under the business record exception to the hearsay rule. *See* Fed. R. Evid. 803(6). Rule 803(6) provides that

> [a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11) [or] Rule 902(12)

shall be admissible at trial, even when introduced for the truth of the matter asserted. *Id.* "Because a business depends on the accuracy of its recordkeeping, its records, although of course not sworn, are likely to be at least reasonably accurate, or at least not contrived for the purpose of making the business look better if it is sued." *Lust v. Sealy, Inc.*, 383 F.3d 580, 588 (7th Cir. 2004).

In this case, Cain's score sheet[11] is precisely the type of

---

[11] This score sheet was prepared by Cathy McNamara, the second interviewer; the score sheet for Cain's interview prepared by Mr. Javetz is not in the record. The defendants, however, do not contest that the hand-written notes on the score sheet prepared

(continued...)

"memorandum" or "record" that falls within the ambit of
the business record exception. Fed. R. Evid. 803(6). First, the
parties do not dispute that interviews were conducted, the
sheets completed and kept, and the notes taken in the
normal course of business. It was the "regular practice" of
the School District to conduct certification interviews of
Group V employees pursuant to their agreement for certifi-
cation testing with the union. *Id.* Moreover, it was the
School District's regular practice to keep records of these
interviews. *Cf.* R.32, Ex.1 at 1-2.[12] Second, the Cain score

---

(...continued)

by McNamara reflect accurately the events of the interview.
Notably, McNamara's notes indicate that, although Cain did not
bring with him to the interview his M.S.D.S. materials, he
nevertheless was asked by the interviewers the questions
associated with those materials.

[12] The defendants contend that, even if Cain's score sheet itself is
a business record, the "examiner's handwritten notes[] [on that
score sheet] cannot be interpreted as . . . a business record."
Appellees' Br. at 16. These notes, however, are part of the
admissible business record: The notes were made at the time of
the interview by a person with knowledge, and, like the rest of
the document, were kept with personnel records by the School
District in the ordinary course of business. *See also Crimm v.
Missouri Pac. R.R. Co.*, 750 F.2d 703, 709 (8th Cir. 1984) (holding
that handwritten notes taken during an interview and kept with
the interview report were admissible as a business record).

The defendants further argue that, because it is impossible
to identify who made the handwritten notes, the plaintiff cannot
authenticate this crucial portion of the document. But only two
individuals—McNamara and Mr. Javetz—administered the
hands-on exam to Cain; one logically can conclude that these two
individuals, and the custodian of School District records, were
the persons with primary access to the document and likely are

(continued...)

sheet was completed "at or near the time" of the events in question, Fed. R. Evid. 803(6); there is no reason to believe that the handwritten comments, such as the notation that Cain had forgotten his M.S.D.S. materials, were not made during the interview itself. Lastly, the score sheet was completed by "person[s] with knowledge"—the interviewers, McNamara and Mr. Javetz; these two administrators filled out the score sheet as a way to transmit information about the content of the interview to other School District officials, in order to facilitate an informed certification decision and to maintain accurate personnel records.

The defendants respond that Cain's hands-on score sheet has not been properly authenticated because, in response to the motion for summary judgment, Mr. Thanongsinh "did not present testimony from the person who created the record." Appellees' Br. at 15. But Mr. Thanongsinh need not present testimony from the interviewers themselves; rather, Rule 803(6) permits the authentication of a business record by the "custodian" of the record or any "other qualified witness." Fed. R. Evid. 803(6). Ordinarily, the custodian or other qualified witness will testify in court that it was the "regular practice" of the

---

[12] (...continued)

the persons who made the notation in question. They can be called at trial and can authenticate the handwritten note if necessary. Moreover, no evidence has been offered by the defendants to suggest that the chain of custody was broken, or that any other individual had access to or tampered with this record. *Cf. United States v. King*, 613 F.2d 670, 673 (7th Cir. 1980) (holding that Social Security Administration interview forms were business records and admissible at trial, given that the defendants had failed to identify a "danger of unreliability" in the manner in which the forms were kept).

business to make and keep the business record. *Id.* Alternatively, the plaintiff can certify the document under Rule 902(11) or 902(12), both of which require the plaintiff to introduce at trial a "written declaration" by the custodian or other qualified person that the record:

> (A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

> (B) was kept in the course of the regularly conducted activity; and

> (C) was made by the regularly conducted activity as a regular practice.

Fed. R. Evid. 902(11), 902(12). In both situations, the custodian need not be the individual who "personally gather[ed] . . . in a business record. The custodian of the records need not be in control of or have individual knowledge of the particular corporate records, but need only be familiar with the company's recordkeeping practices." *United States v. Jenkins*, 345 F.3d 928, 935 (6th Cir. 2003) (internal quotation marks and citations omitted).

On appeal from an order granting summary judgment, the party seeking admission of a document as a business record need not have secured already the deposition testimony of these witnesses. Instead, he only need establish that the document has "sufficient indicia of trustworthiness to be considered reliable." *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). Generally,

> to demonstrate such trustworthiness and reliability at the summary judgment stage, the party seeking to offer the business record must attach an affidavit sworn to by a person who would be qualified to introduce the record as evidence at trial, for example, a custodian or

> anyone qualified to speak from personal knowledge that the documents were admissible business records.

*Id.; see also F.D.I.C. v. Patel*, 46 F.3d 482, 484 (5th Cir. 1995) (holding that the affidavits submitted by the plaintiff "constitute[d] appropriate summary judgment evidence adequate to support a grant of summary judgment," given that those affidavits were sworn to by employees of the bank who were familiar with its record-keeping practices and therefore were "qualified to speak from personal knowledge that the documents attached to the affidavits are admissible business records"). The requirement that the party seeking the admission of the evidence must submit supporting affidavits, however, has been relaxed by this court in certain, limited circumstances. For example, in *Woods*, the plaintiff contended that the district court had erred in relying on his arrest report and misdemeanor complaint in granting summary judgment to the defendants because those documents contained inadmissable hearsay; the plaintiff further submitted that the documents were not admissible as business records because they had not been properly authenticated by an affidavit sworn to by the custodian of the record or by an individual with personal knowledge of the events. Although recognizing that, in most cases, an affidavit authenticating the document as a business record is required at summary judgment, we held that an exception is applicable when the party challenging the document's admissibility relied on that same document "for its accuracy" in earlier proceedings, or otherwise "conceded the accuracy of the documents that the [opposing party] sought to introduce." *Woods*, 234 F.3d at 988.

In this case, Mr. Thanongsinh has not submitted an affidavit by the custodian of the School District records, attesting that the Cain score sheet qualifies as a business

record under Rule 803(6). But a careful examination of the record reveals that the defendants have conceded the admissibility of Cain's score sheet.[13] *See id.* First, they admitted in discovery that the score sheet is what the plaintiff purports it to be. As verified by the affidavit sworn to by Mr. Thanongsinh's attorney, *see* R.32, Cain's score sheet was produced by the School District in the course of discovery. The School District then confirmed in its response to the plaintiff's interrogatories that Cain "w[as] tested by Defendant School District U-46," and that Cain's score sheet was the product of hands-on testing for the Group V certification exam. *Id.*, Ex.1 at 1 (producing, in response to an interrogatory, Cain's score sheet). The School District also confirmed that Cathy McNamara was the "individual[] from School District U-46" who filled out the "Hands-On Test Topics" sheet produced by the defendants. *Id.*, Ex.2 at 2 (interrogatory 2).

Our sister circuits have held documents to be admissible under the business record exception under similar circumstances. For example, in *Cerqueira v. Cerqueira*, 828 F.2d 863 (1st Cir. 1987), the plaintiff disputed the admissibility of an unsigned agreement between the parties prepared by the plaintiff's attorney for use in an earlier case between them. The plaintiff conceded that he had drafted the document, but nevertheless argued that the defendant was required to authenticate the document as a business record. The First Circuit recognized that, generally speaking, the document should have been introduced "into the record through affidavits." *Id.* at 865. However, it held, there was

---

[13] In addition, the defendants do not contest that the document—absent the handwritten notes—is admissible as a business record, nor do they contend that the plaintiff is required to depose or obtain an affidavit from the custodian of the records.

"no point in remanding this case to permit [the defendant] to file an affidavit stating the very thing that [the plaintiff] has conceded, namely, that the document is what it purports to be." *Id.*; *see also Woods*, 234 F.3d at 989 (noting that the reasoning in *Cerqueira* is "persuasive and applicable to the facts of this case"). As in *Cerqueira*, the defendants' responses to the interrogatories in this case provide us with sufficient assurance that Cain's score sheet was made at the time of the interview by a person with knowledge and was prepared and kept in the course of the regularly conducted business activity of certifying Group V custodians under the Collective Bargaining Agreement, rendering a remand to "permit [Mr. Thanongsinh] to file an affidavit" on this question unnecessary. *Cerqueira*, 828 F.2d at 865.

Second, the School District, by relying on Mr. Thanongsinh's score sheet, which is substantially similar in all material respects to the score sheet completed in the course of Cain's interview, has conceded the accuracy of these documents. *See* Defs.' Motion for Summary Judgment, R.23 at 9 (relying on the score sheets from Mr. Thanongsinh's interview in the course of argument); Defs.' St. of Undisputed Mat'l Facts, R.24 at 5-6; *id.*, Ex.L (summarizing the contents of Mr. Thanongsinh's score sheet). Both score sheets necessarily were prepared and kept by the School District in the same manner and according to the same internal procedures. As we did in *Woods*, we therefore conclude that the defendants "cannot reasonably question the reliability" of score sheets made by School District employees and produced in the course of this litigation. *Woods*, 234 F.3d at 989. "Requiring authenticating affidavits in this case would be an empty formality." *Id.*

Even if this were not true, the Cain score sheet would be admissible against the School District as an admission by one of its representatives under Federal Rule of Evidence

801(d)(2). Rule 801(d)(2)(A) provides that written statements may be admitted as non-hearsay against the party who made the statement in their "individual or . . . representative capacity." Fed. R. Evid. 801(d)(2). In this case, Cathy McNamara, the person who filled out the score sheet, is a "representative" of the School District, *id.*, or a "person authorized" to complete the score sheet, *id.* 801(d)(2)(C). As under Rule 803(6), Mr. Thanongsinh still would be required to lay a foundation for the document's status as an admission by a party-opponent under Rule 801(d)(2). Authentication for the purposes of Rule 801(d)(2) is governed by Rule 901(a), which requires that the plaintiff prove that the document is "what its proponent claims." Fed. R. Evid. 901(a); *see also United States v. Dhinsa,* 243 F.3d 635, 658 (2d Cir. 2001) ("Rule 901 does not erect a particularly high hurdle." (internal quotation marks omitted)). Rule 901's requirements are satisfied if evidence has been introduced from which a reasonable juror could find that the document is authentic. *See Dhinsa,* 243 F.3d at 658. This standard has been met in this case. As discussed previously, the School District admitted in its response to the plaintiff's interrogatories that Cain's score sheet was completed by a School District employee. *See* R.32, Ex.1 at 1; *id.*, Ex.2 at 2 (identifying Cathy McNamara as the individual who filled out the score sheet previously produced). One can reasonably conclude from these discovery documents that the Cain score sheet is what the plaintiff claims it to be—the document completed by interviewers in the course of Cain's hands-on certification exam.

Therefore, the district court abused its discretion in refusing to credit this document as evidence that Mr. Thanongsinh was treated less favorably than a similarly

situated individual outside of his protected class.[14]

### 3. Pretext

Now that we have determined that Mr. Thanongsinh has identified a similarly situated individual outside of his protected class who was treated more favorably than he, the burden shifts to the defendants to identify a non-discrimina-

---

[14] Mr. Thanongsinh also suggests that all persons who "participated in the certification testing" can be considered similarly situated for the purpose of this analysis, Appellant's Br. at 23, and that these non-minority candidates were treated more favorably than were minority candidates, *see id.* at 11 (discussing statistical passage rates). We previously have held that a plaintiff can use statistical comparisons between himself and those subject to similar standards but outside of his protected class to develop a case under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Hill v. Burrell Communications Group, Inc.*, 67 F.3d 665, 669 (7th Cir. 1995); *Powers v. Dole*, 782 F.2d 689, 695 (7th Cir. 1986). We have no occasion to address whether the statistical evidence cited by Mr. Thanongsinh demonstrates that he was treated less favorably than an individual similarly situated because he fails to develop his argument in the appropriate fashion. Although he cites a statistical discrepancy between minority and non-minority employees in his Statement of Facts, *see* Appellant's Br. at 11, he does not explore the relevance of these statistics nor even contend that the statistics demonstrate that minorities were treated less favorably than similarly situated non-minorities. *See also Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 529 (7th Cir. 2003) ("It is not enough for [plaintiff] merely to refer generally to these actions in her statement of facts; if she intends to challenge this aspect of the district court's ruling, she must identify the legal issue, raise it in the argument section of her brief, and support her argument with pertinent authority."). We therefore deem the argument waived.

tory reason for Mr. Thanongsinh's demotion. The defendants submit that Mr. Thanongsinh was demoted because he failed to obtain Group V certification, a requirement imposed on all employees similarly situated to the plaintiff. The parties dispute whether Mr. Thanongsinh has established that the defendants' proffered reason for demotion is pretextual, an issue on which Mr. Thanongsinh bears the burden of proof. The district court disregarded each piece of evidence cited by Mr. Thanongsinh on this matter as being based on "pure speculation" or requiring unreasonable inferences. R.40 at 16. Mr. Thanongsinh now responds that, taken together, this evidence creates a material issue of fact regarding whether the true reason for his demotion was his race.

In order for a plaintiff to show that the defendant's explanation for the adverse employment action is pretextual, he must show more than that the decision was "mistaken, ill considered or foolish, [and] so long as [the employer] honestly believes those reasons, pretext has not been shown." *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005) (internal quotation marks omitted and alteration in original). Pretext "means a dishonest explanation, a lie rather than an oddity or an error." *Id.* (internal quotation marks omitted).

In this case, if the plaintiff is correct that the hands-on certification exam was administered in a discriminatory manner, then the defendant's invocation of the results of that exam to justify Mr. Thanongsinh's demotion necessarily cannot be considered a "legitimate, nondiscriminatory reason for the [employment decision]." *McDonnell Douglas*, 411 U.S. at 802. We believe that Mr. Thanongsinh has created a triable issue of fact regarding whether his hands-on exam was administered in a discriminatory fashion and,

therefore, whether the defendants' justification for his demotion is pretextual. Although each piece of evidence offered by Mr. Thanongsinh may not be sufficient standing alone to create a material issue of fact for trial, when this evidence is considered in the aggregate, a reasonable jury could find discriminatory animus in the scoring of the exam.

First, the differential scoring of Cain and Mr. Thanongsinh on Topic 9 of the exam is relevant and probative of the defendants' intent. Both Mr. Thanongsinh and Cain failed to bring with them to the hands-on portion of the exam their M.S.D.S. materials, a prerequisite to being able to answer questions associated with Topic 9. But, as discussed previously, Cain's score sheet indicates that he was asked the questions relevant to these missing materials and scored 10 out of 10, while the plaintiff was not questioned on this matter and was awarded zero points. *See* R.24, Ex.L at D196. From this evidence, a reasonable jury could infer that Mr. Javetz scored the hands-on exam differently for minority and non-minority candidates based on their race.

The defendants respond that the discriminatory scoring of Topic 9 is irrelevant because, even had he scored 10 out of 10 on this topic, Mr. Thanongsinh still would have failed the certification exam and would have been demoted. With the additional 10 points, Mr. Thanongsinh's hands-on score would have been 76.62; averaged with his score of 55 on the written portion of the exam, his composite score would have been 65.81, which constitutes a failing score under the terms of the Collective Bargaining Agreement. *See* Appellee's Br. at 17. This argument misapprehends the import of this evidence under *McDonnell Douglas*. Even if the discriminatory scoring of Topic 9 was not outcome determinative in Mr. Thanongsinh's case, this evidence nevertheless is relevant in assessing the accuracy of Mr. Thanongsinh's

overall score on the exam: The fact that Mr. Thanongsinh was treated differently than non-minority candidates on Topic 9 is probative evidence that the exam *as a whole* may have been administered in a racially discriminatory manner, affecting the scoring of Mr. Thanongsinh's performance on other portions of that exam.[15]

---

[15] The defendants also contend that Mr. Javetz did not cause the demotion of Mr. Thanongsinh because he was interviewed and scored not only by Mr. Javetz but also by Ron Dugo. Dugo, however, admitted in his deposition testimony that, because Mr. Javetz was his direct supervisor, he "took the lead role" in administering the exam. Dugo Dep., R.28, Ex.C at 24. He also conceded that he and Mr. Javetz would "compare" their scores after the hands-on interview and change their scores accordingly. He explained:

Q: Did you compare [interview] notes with [Mr. Javetz]?

A: Yes.

Q: [] [D]id [Mr. Javetz] at any point tell you to change your score or that Linh should have had a lower score on a particular topic?

A: Well, its possible, because we did—when we did compare scores, we did change items at times. We would kind of say give him or take away or—you know, because we both kind of felt one way or the other. And if he was leading, which normally he was, I would lean to his decision.

Q: Before you put a check mark in one of the categories, any of the categories for any of the topics of his scoring sheet, did you first look to see how [Mr. Javetz] scored it?

A: Sometimes.

*Id.* at 43-44. This deposition testimony creates a triable issue of fact regarding whether Mr. Javetz's allegedly discriminatory scoring of the hands-on certification exam impacted Dugo's

(continued...)

Mr. Thanongsinh also contends that comments made by Mr. Javetz at his post-demotion grievance meeting demonstrate pretext. Specifically, in his affidavit, he claims that, at this meeting, Mr. Javetz responded without sympathy to his concerns about the administration of the certification exam. According to Mr. Thanongsinh, after explaining his

> side of the story regarding the hands-on portion of the certification testing program[,] Mr. Javetz crossed his arms and said in an argumentative manner that he could not understand me. He immediately thereafter stated that I should learn better English.

R.28, Ex.D at 2 (also claiming that these comments were unprovoked by statements by the plaintiff "in regard to the written portion of the certification test or [his] English language abilities").[16]

---

[15] (...continued)
scoring, and, ultimately, affected Mr. Thanongsinh's overall score on the exam.

[16] The defendants argue that, because Mr. Thanongsinh did not describe these events in this fashion in his deposition, his affidavit should not be considered by this court. To be sure, Mr. Thanongsinh's deposition provides only minimal detail about the grievance meeting and contains no reference to Mr. Javetz crossing his arms or speaking in an "argumentative manner." R.28, Ex.D at 2. We previously have held that "self-serving statements in affidavits *without factual support in the record* carry no weight on summary judgment." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004) (emphasis in original). However, when the affidavit is "supported by facts in the record," it can be relied on to survive summary judgment. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004) (holding that

(continued...)

Under *McDonnell Douglas*, "the task of disambiguating ambiguous utterances is for trial, not for summary judgment." *Huff v. UARCO, Inc.*, 122 F.3d 374, 384 (7th Cir. 1997) (internal quotation marks omitted). Construing the evidence in the light most favorable to Mr. Thanongsinh, as is required at this stage of proceedings, Mr. Javetz's remark about the plaintiff's English language abilities shows pretext.[17] Although the defendants characterize this comment as a "stray remark[]" and as helpful advice, *see*

---

[16] (...continued)
the court may consider self-serving statements in an affidavit at summary judgment if they: (a) "have factual support in the record"; and (b) are based on "personal knowledge" (internal quotation marks omitted)). In this case, as in *Butts*, Mr. Thanongsinh's description of events has factual support in the record. The defendants admit that, in his deposition testimony, Mr. Thanongsinh described the event generally and acknowledged Mr. Javetz's statement about needing to learn better English. Although the affidavit did include additional detail about the event, this description was not "materially different from positions taken in the past" and therefore can be considered by this court on appeal. *United States v. Funds in Amount of $30,670*, 403 F.3d 448, 466 (7th Cir. 2005).

[17] By contrast, Mr. Thanongsinh's discussion of the "calming instructions" given by one of the interviewers, Cathy McNamara, is unavailing. According to Mr. Thanongsinh, in the course of administrating the hands-on portion of the exam, McNamara routinely gave interviewees instructions to "calm them down a little bit." Appellant's Br. at 12. But the plaintiff can point to no evidence that either Mr. Javetz or Dugo, the administrators of Mr. Thanongsinh's exam, *ever* gave these same instructions, much less that they gave the instructions selectively only to Caucasian candidates. In the absence of such evidence, this argument does not support an inference of pretext.

Appellees' Br. at 23 (noting that Mr. Javetz simply suggested to the plaintiff that he "explore low cost options" to improve his English abilities), the context of the statement—a grievance meeting at which the reasons for the demotion of an Asian-American custodian were being explored by union and School District representatives—leads us to conclude that the statement could be interpreted reasonably by a juror as probative evidence that Mr. Javetz harbored animus against persons for whom English is a second language. This is particularly true given that the comments were made by Mr. Javetz "close in time and in substance to the alleged act of discrimination." *Volovsek v. Wisconsin Dept. of Agric., Trade & Consumer Protection*, 344 F.3d 680, 690 (7th Cir. 2003). Because determining the significance of these events is a task more appropriate "for trial, not for summary judgment," *Huff*, 122 F.3d at 384 (internal quotation marks omitted), we reverse the judgment of the district court that the plaintiff did not meet his burden under *McDonnell Douglas* of showing that the defendants' proffered reason for his demotion was pretextual. We remand for proceedings consistent with this opinion.

### B.  42 U.S.C. § 1981

Like Title VII, section 1981 prohibits discrimination against an employee, and "[t]he same standards governing liability under Title VII apply to section 1981." *Gonzalez v. Ingersoll Milling Mach. Co.,* 133 F.3d 1025, 1035 (7th Cir. 1998); *see also Bennett v. Roberts*, 295 F.3d 687, 697 (7th Cir. 2002). Section 1981, however, is limited in scope to discrimination on the grounds of race in the "mak[ing] and enforc[ing] [of] contracts." 42 U.S.C. § 1981(a). We have concluded that Mr. Thanongsinh has created an issue of material fact with regard to whether he was demoted

because of his race in violation of Title VII; therefore, we only must concern ourselves with the question of whether the alleged discrimination took place in the context of the making or enforcing of a contract.

The defendants contend that, even if Mr. Thanongsinh has established a prima facie case of discrimination, Mr. Javetz did not interfere with the making or enforcement of a contract and therefore cannot be held liable under § 1981. The defendants do not dispute that Mr. Thanongsinh's employment with the School District was governed by contract, or that his demotion constitutes interference with the terms of a contractual relationship. Instead, they submit that there is no causal relationship between the alleged discrimination and the contractual interference. Because Mr. Thanongsinh's "title, responsibilities, and compensation" were altered only after he failed the written exam on his third attempt, the defendants contend, the change in contractual terms can be attributed to his own incompetence, rather than to any particular action taken by the School District or by Mr. Javetz. Appellees' Br. at 26.

This argument relies on the same bootstrapping we already have disclaimed. Mr. Thanongsinh has created a triable issue of fact that he failed the certification exam only because it was scored in a discriminatory manner; if a jury finds in Mr. Thanongsinh's favor on his Title VII claim, it also could conclude that, but for the defendants' actions, Mr. Thanongsinh would not have been required to retake the test and no demotion—and thus no change in his contractual relationship with the School District— would have occurred. We therefore reverse the district court's judgment granting summary judgment to Mr. Javetz in his individual capacity on Mr. Thanongsinh's § 1981 claim and remand for further proceedings consistent with this opinion.

**Conclusion**

For the reasons set forth in the foregoing opinion, we affirm the district court's dismissal of Mr. Thanongsinh's Title VII claim against Mr. Javetz in his official capacity. We reverse the district court's order granting summary judgment to the defendants on Mr. Thanongsinh's Title VII claim against the School District and on Mr. Thanongsinh's § 1981 claim against Mr. Javetz in his individual capacity. We remand for proceedings consistent with this opinion. Mr. Thanongsinh may recover his costs in this court.

AFFIRMED IN PART;
REVERSED AND REMANDED IN PART

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*